[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

No. 00-15158

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
OCT 18, 2002
THOMAS K. KAHN
CLERK

D.C. Docket No. 98-02011-CV-WBH-1

GEORGE M. WEAVER, D. WILLIAM TINKLER,
ROBERT A. ROHM,

Plaintiffs-Appellants-Cross-Appellees,

versus

ALICE D. BONNER, CHARLES A. HARRIS,
JOHN A. JAMES, EARLE B. MAY, JR., individually and in his
official capacity as a member of the Georgia Judicial Qualifications Commission,

Defendants-Appellees-Cross-Appellants,

STATE BAR OF GEORGIA,

Defendants-Appellees.

Appeals from the United States District Court
for the Northern District of Georgia

(October 18, 2002)

Before TJOFLAT, DUBINA and DUHE*, Circuit Judges.

_____

*Honorable John M. Duhe, Jr., U.S. Circuit Judge for the Fifth Circuit, sitting by
designation.

TJOFLAT, Circuit Judge:

I.

A.

Justices of the Georgia Supreme Court are elected by popular vote.[1] Ga. Const., art. VI, § VII, ¶ I. The Judicial Qualifications Commission ("JQC"),[2] operating through its Special Committee on Judicial Election Campaign Intervention ("Special Committee"), monitors these judicial elections for compliance with Canon 7(B) of the Georgia Code of Judicial Conduct.[3] Canon 7(B)(1)(d) provides that candidates for any judicial office that is filled by public election between competing candidates

> shall not use or participate in the use of any form of public communication which the candidate knows or reasonably should know is false, fraudulent, misleading, deceptive, or which contains a material misrepresentation of fact or law or omits a fact necessary to make the communication considered as a whole not materially

---

[1] All superior court and state court judges are also elected by popular vote. Ga. Const., art. VI, § 7, ¶ I.

[2] The JQC was created by constitutional amendment in 1972, and it was vested with the "power to discipline, remove, and cause involuntary retirement of judges." Id. art. VI, § 7, ¶ VI.

[3] Pursuant to constitutional authority, the Georgia Supreme Court adopted the Georgia Code of Judicial Conduct and the Rules of the Judicial Qualifications Commission. See id. art. VI, § 7, ¶ VII; Ga. R. Jud. Qual. Comm'n, intro. Canon 7 of the Code of Judicial Conduct generally prohibits judges from engaging in "[p]olitical [a]ctivity [i]nappropriate to [t]heir [j]udicial [o]ffice." Ga. Code of Judicial Conduct Canon 7. Canon 7(B) specifically addresses the conduct of judicial candidates during election campaigns. Id. Canon 7(B).

2

> misleading or which is likely to create an unjustified expectation about results the candidate can achieve.

Ga. Code of Judicial Conduct Canon 7(B)(1)(d). Canon 7(B)(2) provides that judicial candidates "shall not themselves solicit campaign funds, or solicit publicly stated support." Id. Canon 7(B)(2). Canon 7(B)(2) further provides that a judicial candidate can establish an election committee to do these solicitations for him. Id.

JQC Rule 27 is the mechanism through which the JQC enforces Canon 7 during judicial elections. Rule 27 provides that in every year in which a general election is held, the Chair shall name three JQC members to the Special Committee "whose responsibility shall be to deal expeditiously with allegations of ethical misconduct in campaigns for judicial office." Ga. R. Jud. Qual. Comm'n 27. During judicial election campaigns, the Director of the JQC forwards to the Special Committee all complaints he receives that facially indicate a violation of Canon 7 by a judicial candidate. Id. Rule 27(b). If the Special Committee determines after investigation that speedy intervention is warranted, it issues a confidential cease and desist request to the candidate found to be engaging in unethical or unfair campaign practices in violation of Canon 7. Id. Rule 27(b)(3). If the cease and desist request is disregarded or if the unethical or unfair campaign practices otherwise continue, the Special Committee is authorized immediately to release to

the media a public statement setting out the violations found to exist and the candidate's failure to honor the cease and desist request.  Id. Rule 27(b)(4)(A).[4]

Standard 74 of the State Bar of Georgia provides that "[a] lawyer who is a candidate for judicial office shall comply with the provisions of the Code of Judicial Conduct applicable to candidates for judicial office.  A violation of this Standard may be punished by disbarment."[5]  Ga. State Bar R. 4-102 Std. 74.

## B.

In 1998, George M. Weaver ran for election to the Georgia Supreme Court and was defeated by the incumbent candidate, the Honorable Leah Sears.  During his campaign, Weaver distributed a brochure ("first brochure") characterizing Justice Sears's views on same-sex marriage, traditional moral standards, and the electric chair.  On June 1, 1998, the JQC received two complaints about Weaver's first brochure.  The Special Committee reviewed the complaints and the brochure and concluded that they facially indicated possible violations of Canon 7(B)(1)(d) of the Code of Judicial Conduct.  On June 4, the Special Committee sent Weaver a

---

[4] If the cease and desist request is disregarded, the Special Committee also has the option "to refer the matter to the full Commission for such action as may be appropriate under the applicable rules."  Ga. R. Jud. Qual. Comm'n 27(b)(4)(B).

[5]  Effective January 1, 2001, the Standards of Conduct listed in State Bar Rule 4-102 were replaced by the Rules of Professional Conduct.  Standard 74 was replaced by Rule 8.2(b), which provides  that "[a] lawyer who is a candidate for judicial office shall comply with the applicable provisions of the Code of Judicial Conduct.  The maximum penalty for a violation of this rule is disbarment."  Ga. State Bar R. 4-102, Rule 8.2(a).

4

letter inviting him to respond to the complaints about his brochure, in accordance with Rule 27(b)(1).[6]  After reviewing the materials submitted by Weaver, the Special Committee concluded that portions of the first brochure violated Canon 7(B)(1)(d) and issued a confidential cease and desist request on June 11. Specifically, the Special Committee found the following statements about Justice Sears in Weaver's first brochure to be false, misleading, and deceptive in violation of Canon 7(B)(1)(d):

(1)    "She would require the State to license same-sex marriages...."
(2)    "She has referred to traditional moral standards as 'pathetic and disgraceful.' "
(3)    "Justice Sears has called the electric chair 'silly,' " with the words "THE DEATH PENALTY" in an adjacent column.

After receiving the confidential cease and desist request, Weaver revised the brochure's language on June 15 and distributed a second brochure.  The revised language in the second brochure read in part:

(1)    "She has stated that 'it is not yet a perfect world' because 'lesbian and gay couples in America cannot legally marry.' "
(2)    "When the Supreme Court upheld a traditional moral standard, she said the result was 'pathetic and disgraceful.' "
(3)    "Justice Sears says she supports the death penalty but has called the electric chair 'silly.' "

---

[6] Rule 27(b)(1) provides that, after receiving a copy of the complaint from the JQC Director, the Special Committee shall "[s]eek, from the complainant and/or the subject of the complaint, such further information on the allegations of the complaint as it deems necessary."  Ga. R. Jud. Qual. Comm'n 27(b)(1).

5

Weaver and his campaign committee then produced and aired a television advertisement in support of his campaign, which included the following:

(1)     The narrator states: "What does Justice Sears stand for? Same sex marriage." This statement is made while a graphic shows: "Same Sex Marriage."
(2)     The narrator states: "She's questioned the constitutionality of laws prohibiting sex with children under fourteen." This statement is made while a graphic shows: "Questioned Laws Protecting Our Children."
(3)     The narrator states: "And she called the electric chair silly." This statement is made while a graphic shows: "Called Electric Chair Silly."

On July 14, the JQC received three complaints about the television advertisement. After reviewing these complaints, the Special Committee concluded that the television advertisement violated its previous cease and desist request regarding the first brochure. On July 15, the Special Committee issued a public statement to the media, in accordance with Rule 27(b)(4)(A), which stated that Weaver had "intentionally and blatantly" violated the original cease and desist request and deliberately engaged in "unethical, unfair, false and intentionally deceptive" campaign practices. In the election held six days later, Weaver was defeated by Justice Sears. On July 3, the JQC forwarded its materials on Weaver to the General Counsel for the State Bar of Georgia for possible disciplinary action under Standard 74.

C.

6

On July 16, 1998, one day after the Special Committee issued its public statement, Weaver, joined by John Traylor, a registered voter in Georgia,[7] brought this law suit against the members of the Special Committee and the director of the JQC in both their individual and official capacities. They alleged that Canons 7(B)(1)(d) and 7(B)(2) and Rule 27 unconstitutionally interfere with free speech on their face and as applied to them by the Special Committee, and requested injunctive relief, damages, and a special election. On August 24, 1998, the individual defendants moved the court to dismiss the complaint, contending among other things that, as sued in their official capacities, they were immune from suit under the Eleventh Amendment, and as sued in their individual capacities they were entitled to qualified immunity.

Following some reciprocal discovery, the plaintiffs obtained leave of court to file a second amended complaint, which added the State Bar of Georgia as a party defendant.[8] At the same time, the court addressed the defendants' claims of

---

[7] On June 8, 1999, the district court entered a consent order which substituted appellants D. William Tinkler and Robert A. Rohm, also registered voters in Georgia, as co-plaintiffs in place of Traylor.

[8] At this point, the plaintiffs were asserting the following claims: Count I, an as applied challenge to Canon 7 and Rule 27 under the First and Fourteenth Amendments; Count II, a facial challenge to Canon 7 and Rule 27 under the First and Fourteenth Amendments; Count III, denial of adequate procedures under Rule 27 in violation of the Due Process Clause of the Fourteenth Amendment; Count IV, a claim that Canon 7 and Rule 27 are invalid under the Due Process Clause of the Fourteenth Amendment because their language is "vague"; Count V, a request for a special election as a remedy for the claims presented in the preceding counts.

immunity from suit. On March 16, 1999, the court granted the individual

defendants qualified immunity with respect to the plaintiffs' claims for damages,

rejected the defendants' remaining grounds for dismissal, and denied the plaintiffs'

request for a special election. The court denied that request because plaintiffs had

not shown "extraordinary circumstances" that would entitle them to a special

election. Specifically, they had not alleged, much less established, that Georgia

voters were deprived of an election, nor did they allege voter fraud, vote dilution,

or any similar scheme that would require a special election.

After receiving cross-motions for summary judgment, the district court, in

an order entered on August 25, 2000, concluded that Canon 7(B)(1)(d) is facially

unconstitutional because it "chills" core political speech and violates the

overbreadth doctrine by prohibiting false statements of fact made without

knowledge or reckless disregard of falsity.[9] The court was not persuaded,

however, that Canon 7(B)(2) and Rule 27 violate the First Amendment. In the

court's view, both are narrowly tailored to serve the compelling interest of

preserving the integrity and independence of Georgia's judiciary.[10] Finally, the

court found that the process afforded a candidate standing in Weaver's shoes by

---

[9] This ruling disposed of the Count II facial challenge to Canon 7(B)(1)(d) and rendered moot the plaintiffs' Count I as applied challenge to Canon 7(B)(1)(d).

[10] These rulings disposed of the Count I and II challenges to Canon 7(B)(2) and to Rule 27.

Rule 27 is constitutionally adequate.[11]  On August 28, 2000, the court entered final judgment, echoing these rulings.  The plaintiffs now appeal the district court's rejection of their challenges to Canon 7(B)(2) and Rule 27, their request for a special election, and their claims for damages against the individual defendants in their non-official capacities.  The defendants cross-appeal the district court's decision invalidating Canon 7(B)(1)(d).

## II.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech ...."  U.S. Const. amend. I.  This prohibition on laws abridging the freedom of speech has been incorporated into the Fourteenth Amendment so that it also applies to state governments.  An overbreadth challenge is based on a statute's "possible direct and indirect burdens on speech."  United States v. Acheson, 195 F.3d 645, 650 (11th Cir. 1999) (quoting Am. Booksellers v. Webb, 919 F.2d 1493, 1499-1500 (11th Cir. 1990)).  The overbreadth doctrine "permits the facial invalidation of laws that inhibit the exercise of First Amendment rights if the impermissible applications of the law are substantial when 'judged in relation to the statute's plainly legitimate sweep.' "  City of Chicago v. Morales, 527 U.S. 41, 52, 119 S. Ct. 1849, 1857, 144 L. Ed. 2d 67 (1999) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 612-15, 93 S. Ct. 2908, 37

---

[11]  This ruling disposed of the Count III and IV due process challenges to Rule 27.

L. Ed. 2d 830 (1973)).  The doctrine is designed to protect "the public from the chilling effect such a statute has on protected speech; the court will strike down the statute even though the governmental entity enforced the statute against those engaged in unprotected activities."  Acheson, 195 F.3d at 650 (quoting Nationalist Movement v. City of Cumming, 934 F.2d 1482, 1485 (11th Cir. 1991) (Tjoflat, J., dissenting)).

A candidate's speech during an election campaign "occupies the core of the protection afforded by the First Amendment."  McIntyre v. Ohio Elections Comm'n, 514 U.S. 334, 346, 115 S. Ct. 1511, 1518, 131 L. Ed. 2d 426 (1995). The proper test to be applied to determine the constitutionality of restrictions on "core political speech" is strict scrutiny.  Id.  Under strict scrutiny analysis, the government has the burden of proving that the restriction is "(1) narrowly tailored, to serve (2) a compelling state interest."  Republican Party of Minnesota v. White, __ U.S. __, 122 S. Ct. 2528, 2534, 153 L. Ed. 2d 694 (2002); see also Brown v. Hartlage, 456 U.S. 45, 53-54, 102 S. Ct. 1523, 1529, 71 L. Ed. 2d 732 (1982) ("When a State seeks to restrict directly the offer of ideas by a candidate to the voters, the First Amendment surely requires that the restriction be demonstrably supported by not only a legitimate state interest, but a compelling one, and that the restriction operate without unnecessarily circumscribing protected expression.").

A.

10

Appellees contend that Canon 7(B)(1)(d) is narrowly tailored to serve Georgia's compelling interests of "preserving the integrity, impartiality, and independence of the judiciary" and "ensuring the integrity of the electoral process and protecting voters from confusion and undue influence." Appellees' Br. at 33. We disagree.

Although Georgia's asserted interests may be compelling, Canon 7(B)(1)(d) is not narrowly tailored to serve those interests because, by prohibiting false statements negligently made and true statements that are misleading or deceptive, Canon 7(B)(1)(d) does not afford the requisite "breathing space" to protected speech. See Brown, 456 U.S. at 61, 102 S. Ct. at 1533. It is true that false statements are not entitled to the same level of First Amendment protection as truthful statements. See id. at 60 (citing Gertz v. Robert Welch, Inc., 418 U.S. 323, 340, 94 S. Ct. 2997, 3007, 41 L. Ed. 2d 789 (1974)). Moreover, false statements made by candidates during political campaigns "may have serious adverse consequences for the public at large." McIntyre, 514 U.S. at 349, 115 S. Ct. at 1529. Nevertheless, "erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.' " Brown, 456 U.S. at 60-61, 102 S. Ct. at 1532-33 (quoting N.Y. Times v. Sullivan, 376 U.S. 254, 271-272, 84 S. Ct. 710, 721, 11 L. Ed. 2d 686 (1964) (quoting NAACP v. Button, 371 U.S. 415, 433, 83 S. Ct. 328, 338, 9 L. Ed. 2d 405 (1963)). "The chilling effect of . . . absolute accountability

11

for factual misstatements in the course of political debate is incompatible with the atmosphere of free discussion contemplated by the First Amendment in the context of political campaigns." Id. at 61, 102 S. Ct. at 1533. Therefore, to be narrowly tailored, restrictions on candidate speech during political campaigns must be limited to false statements that are made with knowledge of falsity or with reckless disregard as to whether the statement is false – i.e, an actual malice standard. See id. Restrictions on negligently made false statements are not narrowly tailored under this standard and consequently violate the First Amendment. See id. at 61-62, 102 S. Ct. at 1533.

In Brown, the Supreme Court held that it was unconstitutional for a Kentucky appeals court to void a county commissioner election after the Kentucky appeals court found that the winning candidate violated the Kentucky Corrupt Practices Act by stating during his campaign that he would work for a reduced salary; unbeknownst to the candidate, this statement was false because the commissioner's salary was fixed by law. Id. at 47-52, 60-62, 102 S. Ct. at 1526-28, 1532-33. The Court held that, as applied, the Kentucky Corrupt Practices Act did not afford the requisite "breathing space" to core political speech because it prohibited and punished false factual statements that were made without knowledge of their falsity or reckless disregard as to whether they were false. See id. at 61, 102 S. Ct. at 1533. The Court noted that "[i]n a political campaign, a candidate's factual blunder is unlikely to escape the notice of, and correction by,

12

the erring candidate's political opponent. The preferred First Amendment remedy of 'more speech, not enforced silence,' <u>Whitney v. California</u>, 274 U.S. 357, 377, 47 S. Ct. 641, 648, 71 L. Ed. 1095 (1927) (Brandeis, J., concurring), thus has special force." <u>Id.</u>

On its face, Canon 7(B)(1)(d) has the effect of chilling even more core political speech than the statute that was held unconstitutional in <u>Brown</u>. Canon 7(B)(1)(d) not only prohibits false statements knowingly or recklessly made, it also prohibits false statements negligently made and true statements that are misleading or deceptive or contain a material misrepresentation or omit a material fact or create an unjustified expectation about results. <u>See</u> Ga. Code of Judicial Conduct Canon 7(B)(1)(d). For fear of violating these broad prohibitions, candidates will too often remain silent even when they have a good faith belief that what they would otherwise say is truthful. This dramatic chilling effect cannot be justified by Georgia's interest in maintaining judicial impartiality and electoral integrity. Negligent misstatements must be protected in order to give protected speech the "breathing space" it requires. The ability of an opposing candidate to correct negligent misstatements with more speech more than offsets the danger of a misinformed electorate that might result from tolerating negligent misstatements.

Moreover, we are not convinced that Georgia's interest in judicial impartiality is substantially advanced by Canon 7(B)(1)(d) because the risks Georgia is concerned with are not limited to campaign practices by judicial

13

candidates. It is the general practice of electing judges, not the specific practice of judicial campaigning, that gives rise to impartiality concerns because the practice of electing judges creates motivations for sitting judges and prospective judges in election years and non-election years to say and do things that will enhance their chances of being elected. See White, 122 S. Ct. at 2542, 2544 (O'Connor, J., concurring) ("I am concerned that, even aside from what judicial candidates may say while campaigning, the very practice of electing judges undermines this interest [in preserving judicial impartiality].... [By choosing to popularly elect judges] . . . the State has voluntarily taken on the risks to judicial bias described above.... If the State has a problem with judicial impartiality, it is largely one the State brought upon itself by continuing the practice of popularly electing judges.").

Appellees argue that we should adopt a lower standard for judicial elections than for other types of elections because speech by judicial candidates is entitled to less protection than speech by legislative and executive candidates. We disagree. Although there is some support for appellees' position, see, e.g., Buckley v. Ill. Judicial Inquiry Bd., 997 F.2d 224, 228 (7th Cir. 1993) ("Judges remain different from legislators and executive officials, even when all are elected, in ways that bear on the strength in the state's interest in restricting their freedom of speech."), we believe that the Supreme Court's decision in White suggests that the standard for judicial elections should be the same as the standard for legislative and executive elections. In White, the Court struck down Minnesota's "announce

clause" which prohibited a judicial candidate from " 'announc[ing] his or her views on disputed legal or political issues.' " 122 S. Ct. at 2532 (quoting Minn. Code of Judicial Conduct Canon 5(A)(3)(d)(i) (2002)).  In reaching its decision, the Court was not required to decide whether "the First Amendment allows greater regulation of judicial election campaigns than legislative election campaigns" because, even if this were true, the Minnesota law still failed strict scrutiny.  Id. at 2539.  The Court did, however, rely on the standard announced in Brown in reaching its decision, Id. at 2534-35, and, in his majority opinion, Justice Scalia noted that the difference between judicial and legislative elections has been "greatly exaggerate[d]." Id. at 2539.       In dissent, Justice Ginsburg argued that "the rationale underlying unconstrained speech in elections for political office – that representative government depends on the public's ability to choose agents who will act at its behest – does not carry over to campaigns for the bench." Id. at 2551  (Ginsburg, J., dissenting).  Justice Scalia disagreed:  "This complete separation of the judiciary from the enterprise of 'representative government' . . . is not a true picture of the American system" because "[n]ot only do state-court judges possess the power to 'make' common law, but they have the immense power to shape the States' constitutions as well.  Which is precisely why the election of state judges became popular." Id. at 2539 (internal citation omitted).

We agree that the distinction between judicial elections and other types of elections has been greatly exaggerated, and we do not believe that the distinction,

if there truly is one, justifies greater restrictions on speech during judicial campaigns than during other types of campaigns. We therefore adopt the actual malice standard articulated in <u>Brown</u> for regulations of candidate speech during judicial campaigns. As we explained above, Canon 7(B)(1)(d) fails under this standard because it prohibits far more speech than necessary to serve Georgia's compelling interests. We are further persuaded in this regard by the reasoning of <u>Butler v. Ala. Judicial Inquiry Comm'n</u>, 802 So. 2d 207 (Ala. 2001) (<u>Butler II</u>), and <u>In re Chmura</u>, 608 N.W.2d 31 (Mich. 2000), in which the respective states' supreme courts relied on the standard announced in <u>Brown</u> to strike down judicial canons that were similar to the one before us.[12] The Alabama judicial canon at issue in <u>Butler II</u> was originally before this Court. See <u>Butler v. Ala. Judicial</u>

---

[12] Michigan's Canon 7(B)(1)(d), which was found unconstitutional in <u>In re Chmura</u>, was nearly identical to Georgia's Canon 7(B)(1)(d). It provided that a candidate for judicial office "should not use or participate in the use of any form of public communication that the candidate knows or reasonably should know is false, fraudulent, misleading, deceptive, or which contains a material misrepresentation of fact or law or omits a fact necessary to make the statement considered as a whole not materially misleading, or which is likely to create an unjustified expectation about results the candidate can achieve." <u>In re Chmura</u>, 608 N.W. 2d at 36 (quoting Mich. Code of Judicial Conduct Canon 7(B)(1)(d)).

Alabama's Canon 7B.(2), which was held unconstitutional in <u>Butler II</u>, read as follows: "During the course of any campaign for nomination or election to judicial office, a candidate shall not . . . [p]ost, publish, broadcast, transmit, circulate, or distribute false information concerning a judicial candidate or an opponent, either knowing the information to be false or with reckless disregard of whether the information is false; or post, publish, broadcast, transmit, circulate, or distribute true information about a judicial candidate or an opponent that would be deceiving or misleading to a reasonable person." <u>Butler II</u>, 802 So. 2d at 213 (quoting Ala. Canons of Judicial Ethics Canon 7B.(2)).

Inquiry Comm'n, 245 F.3d 1257 (11th Cir. 2001) (Butler I). Because there were pending state proceedings before the Alabama Court of the Judiciary, we certified procedural questions to the Alabama Supreme Court to determine whether we should abstain under Younger v. Harris, 401 U.S. 37, 91 S. Ct. 746, 27 L. Ed. 2d 669 (1971). Butler I, 245 F.3d at 1265-66. In lieu of answering the certified questions regarding the ability to challenge the constitutionality of the judicial canon in the Alabama Court of the Judiciary proceedings, the Alabama Supreme Court held that the canon violated the First Amendment because, like the statute in Brown, it prohibited false statements negligently made and true statements that a reasonable person would find misleading or deceptive. Butler II, 802 So. 2d at 218. The court eliminated the language in the canon prohibiting negligent misstatements and misleading true statements so that the canon only applied to knowing or reckless false statements. Id. We concluded that the court's narrowing of the canon so that it only applied to knowing or reckless false statements rendered the issue of the canon's facial validity moot. Butler v. Ala. Judicial Inquiry Comm'n, 261 F.3d 1154, 1157-58 (11th Cir. 2001) (Butler III).

B.

Canon 7(B)(2) also fails strict scrutiny because it is not narrowly tailored to serve Georgia's compelling interest in judicial impartiality. Canon 7(B)(2) prohibits judicial candidates from personally soliciting campaign contributions and from personally soliciting publicly stated support, but allows the candidate's

17

election committee to engage in these activities. In effect, candidates are completely chilled from speaking to potential contributors and endorsers about their potential contributions and endorsements.

The impartiality concerns, if any, are created by the State's decision to elect judges publicly. Campaigning for elected office necessarily entails raising campaign funds and seeking endorsements from prominent figures and groups in the community. See, e.g., White, 122 S. Ct. at 2542 (O'Connor, J., concurring) ("Unless the pool of judicial candidates is limited to those wealthy enough to independently fund their campaigns . . . the cost of campaigning requires judicial candidates to engage in fundraising.") The fact that judicial candidates require financial support and public endorsements to run successful campaigns does not suggest that they will be partial if they are elected. Furthermore, even if there is a risk that judges will be tempted to rule a particular way because of contributions or endorsements, this risk is not significantly reduced by allowing the candidate's agent to seek these contributions and endorsements on the candidate's behalf rather than the candidate seeking them himself. Successful candidates will feel beholden to the people who helped them get elected regardless of who did the soliciting of support. Canon 7(B)(2) thus fails strict scrutiny because it completely chills a candidate's speech on these topics while hardly advancing the state's interest in judicial impartiality at all.

C.

The issuance of a Rule 27 cease and desist request which prohibits a judicial candidate from engaging in certain speech is an impermissible prior restraint on protected expression. "Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity." Bantam Books, Inc. v. Sullivan, 372 U.S. 58, 70, 83 S. Ct. 631, 639, 9 L. Ed. 2d 584 (1963). "The term prior restraint is used 'to describe administrative and judicial orders *forbidding* certain communications when issued in advance of the time that such communications are to occur.' " Alexander v. United States, 509 U.S. 544, 550, 113 S. Ct. 2766, 2771, 125 L. Ed. 2d 441 (1993) (quoting M. Nimmer, Nimmer on Freedom of Speech § 4.03 (1984)). "Temporary restraining orders and permanent injunctions – *i.e.,* court orders that actually forbid speech activities – are classic examples of prior restraints." Id.

The Supreme Court has consistently recognized a distinction between remedial injunctions and unconstitutional prior restraints. For example, in Near v. Minnesota ex rel. Olson, 283 U.S. 697, 51 S. Ct. 625, 75 L. Ed. 1357 (1931), the Supreme Court invalidated as an unlawful prior restraint a court order that permanently enjoined a newspaper publisher, who had published articles found to violate a state nuisance statute, from publishing any future "malicious, scandalous or defamatory" publications. Similarly, in Vance v. Universal Amusement Co., 445 U.S. 308, 100 S. Ct. 1156, 63 L. Ed. 2d 413 (1980), the Supreme Court struck down a Texas statute authorizing courts, upon a showing that obscene films had

19

been shown in the past, to issue an injunction of indefinite duration against future exhibition of films that had not been found to be obscene. Also, in Org. for a Better Austin v. Keefe, 402 U.S. 415, 91 S. Ct. 1575, 29 L. Ed. 2d 1 (1971), the Supreme Court held that an injunction against distributing leaflets or picketing anywhere within city limits was an unconstitutional prior restraint because "the injunction operates, not to redress alleged private wrongs, but to suppress [speech] on the basis of previous publications ...." Id. at 418-19, 91 S. Ct. at 1577.

A Rule 27 cease and desist request is tantamount to an injunction because it is a prohibition on speech by a judicial candidate. If we assume that the JQC can accurately determine whether a statement violates Canon 7, the cease and desist request is remedial to the extent that it prohibits candidates from repeating verbatim past statements that the JQC has found to be false, misleading, and deceptive. In reality, however, the cease and desist request is also an unconstitutional prior restraint because it also prohibits *future* statements which, although possibly similar to prior statements, have *not* yet been found to be false, misleading, and deceptive. Weaver's case illustrates this point. Weaver made statements about Justice Sears that the JQC found to be false, misleading, and deceptive. After receiving complaints, the JQC issued a cease and desist request because it determined Weaver's statements were false, misleading, and deceptive. Weaver then altered his statements in an effort to comply with the cease and desist request. The JQC found that these statements were also false, misleading, and

20

deceptive, but instead of issuing a cease and desist request to remedy the new misstatements, the JQC found that these statements were similar enough to the original statements that they violated the original cease and desist request, and it issued a damaging public statement which had the imprimatur of the government. Therefore, as in Near, Keefe, and Vance, the cease and desist request, in addition to prohibiting repetition of past statements found to be false, also prohibited future statements that had not been found to be false when prohibited. Just like the injunctions in those cases, the cease and desist request is an unconstitutional prior restraint on speech.

Weaver continued to speak in the face of the cease and desist request. Most candidates would not. If a candidate violates a cease and desist request, the JQC may issue to all media outlets a damaging public statement which has the imprimatur of the government. See Ga. R. Jud. Qual. Comm'n 27(b)(4)(A). The candidate may also be disciplined by the State Bar, and perhaps even disbarred, if the JQC finds that he violated the cease and desist request. See Ga. State Bar R. 4-102. These risks, combined with the difficult determination of whether new, similar statements will correct the flaws the JQC found in the candidate's original statement, will lead to a dramatic chilling effect on speech. For these reasons, the JQC has failed to overcome the "heavy presumption" against the cease and desist request's constitutional validity, and we find the cease and desist request to be an unconstitutional prior restraint.

III.

We find that the district court was correct in determining that defendants were entitled to qualified immunity from civil damages. "Despite their participation in this constitutionally impermissible conduct, [the defendants] may nevertheless be shielded from liability for civil damages if their actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " Hope v. Pelzer, __ U.S. __, 122 S. Ct. 2508, 2515, 153 L. Ed. 2d 666 (2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738, 13 L. Ed. 2d 396 (1982)). Although we find today that portions of Canon 7 and the Rule 27 cease and desist request are unconstitutional, we do not believe that this unconstitutionality was "clearly established" in 1998 so that a reasonable person would have known that enforcing these laws was unconstitutional. As late as 2001, we found it unnecessary to intervene in a state proceeding because it was not clearly established that a judicial canon prohibiting false, misleading, and deceptive statements was blatantly unconstitutional. Butler I, 245 F.3d at 1265 (finding it unnecessary to intervene in state proceeding because "while we today make no decision about the constitutionality of Alabama's judicial canons, we doubt that [Alabama's equivalent of Canon 7(B)(1)(d)] patently or fragrantly [sic] violates the Constitution 'in every clause, sentence, and paragraph, and in whatever manner and against whomever an effort might be made to apply it.' Younger, 91 S. Ct. at 755."). The unconstitutionality of Canon 7(B)(2) and the

22

Rule 27 cease and desist request was likewise not clearly established in 1998. Defendants are therefore entitled to qualified immunity for their conduct in enforcing these state laws.

IV.

We also find that a special election is not an appropriate remedy for plaintiffs' grievances. We require extraordinary circumstances to exist before we will overturn state election results and impose a special election. For example, in Duncan v. Poythress, 657 F.2d 691, 704-08 (5th Cir. Unit B 1981), the former Fifth Circuit[13] found extraordinary circumstances and imposed a special election where the fundamental right of the voters was abrogated by the appointment, rather than election, of a judge. There are no such extraordinary circumstances here. The voters in this case were not deprived of an election as in Duncan, nor is there an allegation of voter fraud, vote dilution, or a similar scheme which would mandate a special election. See, e.g., Smith v. Cherry, 489 F.2d 1098 (7th Cir. 1993) (reversing dismissal of complaint seeking special election where complaint alleged scheme in which "sham" candidate's name was placed on primary ballot to deceive voters into voting for one candidate when they believed they were voting for another). The voters in this case were free to vote for their candidate of choice.

---

[13] In Stein v. Reynolds Securities, Inc., 667 F.2d 33 (11th Cir. 1982), this court adopted as binding precedent all decisions of Unit B of the former Fifth Circuit handed down after September 30, 1981.

More voters chose to vote for Sears than for Weaver. This does not entitle Weaver or those who voted for him to a special election.

V.

For the foregoing reasons, we find that the portions of Canon 7 and the Rule 27 cease and desist request at issue in this appeal are unconstitutional; defendants are entitled to qualified immunity; and plaintiffs fail to allege extraordinary circumstances that would require a special election. Accordingly, the orders of the district court are AFFIRMED in part and REVERSED in part.

SO ORDERED.